UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF TEXAS

M. GENE MARLIN, *et al.*, §
§
Plaintiffs, §
*versus* § CIVIL ACTION H-04-4443
§
§
MOODY NATIONAL BANK, N.A., *et al.*, §
§
Defendants. §

# Opinion on Summary Judgment

1. *Introduction.*

A business man and one of his banks sue another of his banks for plotting with his partner to steal from them. They say the bank and its officer were both negligent and actively conspiring with the crooked partner. The defendants have moved for summary judgment and will prevail.

2. *Partners.*

Larry M. Nixon was a crane broker in Texas. M. Gene Marlin was in the crane business in Indiana. In the early 1990s, the two met when Marlin bought a crane from Nixon. Over the next four years, Marlin bought four or five more cranes from him.

In 1997, Nixon approached Marlin about financing a crane deal. Nixon thought that he could profit reselling a crane, but he did not have the capital to buy it. Marlin funded the flip, and they split the profits. After a few similar transactions, the two started a company to broker cranes – Delta Mike, Inc. Marlin owned 51%, and Nixon owned 49%. They agreed to split the profits evenly.

Under their agreement, Delta Mike was to identify a crane on the market, find a buyer, acquire it, and sell it nearly simultaneously. The acquisitions would be funded by

bank loans. From Houston, Nixon would find an available crane and a willing buyer. He then would send Marlin a sales agreement. Delta Mike's form contracts required Marlin's individual approval. From Indiana, Marlin would obtain financing, and he would have the bank wire the money to Nixon. Both owners personally guaranteed the loans. After Nixon bought the crane and resold it, he would wire money to Delta Mike's account in Indiana. Marlin would re-pay the bank, and they would split what remained.

For many years, Nixon's company – L&D Interests, Inc., doing business as Delta Crane – bought and sold cranes as the agent of Delta Mike. The bank wired funds to Delta Crane, and after the sale, Nixon paid Delta Mike from the Delta Crane account. Marlin says that Nixon convinced him that Delta Crane was well-known in the industry and his contacts would prefer to deal with it.

3. *Operations.*

In August 2001, Nixon opened a personal account and an account for L&D, doing business as Delta Crane, at Moody National Bank in Clear Lake City, Texas. Marlin was not a signatory on these accounts.

In October 2002, at the same Moody branch, Nixon and Marlin opened an account for Delta Mike, Inc., doing business as Delta Crane. Marlin wanted L&D to stop acting as Delta Mike's agent; he wanted Delta Mike to purchase cranes directly and the bank to wire funds directly to the sellers. Both men were signatories with full and equal access to the account. Both owners also had Internet access to the account. They told the bank to send the paper statements to Nixon's address in League City, Texas. Both Clear Lake City and League City are suburbs to the southeast of Houston.

In the spring of 2003, Marlin considered selling the business. He thought that several companies were leasing cranes from Delta Mike with an option to buy them. Marlin told Nixon to ask those companies to sign new leases that included an agreement to buy at the end of 2003. By July, Nixon had not secured the new agreements. Marlin came to Texas to meet personally with three of the lessees. In Houston, only one of them came to the Delta Mike office to sign the new agreement. Nixon told Marlin that the

other two had been called out of town. A few days after Marlin returned to Indiana, Nixon faxed the other two executed agreements to him.

Later that month, Marlin asked Nixon about another outstanding payment. Nixon assured Marlin that he would take care of it. When he did not, Marlin called the buyer directly to check on its payment. The buyer said that he had no knowledge of the sale, and Marlin realized that he had been duped.

As Nixon's scheme unraveled, he faked his death in an accident, intentionally wrecking his boat in Galveston Bay.

4. *Discovery.*

Marlin came to Texas and learned how Delta Mike had actually operated. Although some of the deals were real, Nixon had invented most of them. First, Nixon would direct a purported seller – often a company Marlin knew – to prepare an invoice for a crane that it did not own and send it to Marlin. Marlin would approve the sale and request that the bank fund the acquisition. The bank would then send the money to the seller. The seller would keep a share and forward the rest to one of the bank accounts controlled by Nixon.

Then, Nixon would send Marlin a fake agreement for a sale or lease showing a modest positive difference. That left Nixon with the gross purchase price funded by the bank less the seller's share and Marlin's one-half of the profit.

Nixon pleaded guilty to two counts of bank fraud. He was sentenced by this court to 87 months in prison.

5. *Suing.*

Marlin and Old National Bank – an Indiana bank that loaned over $6 million dollars to Delta Mike on the guarantees of Marlin and Nixon – originally sued twenty-five parties for (a) fraud, (b) negligence, (c) conspiracy to violate the Racketeering Influenced & Corrupt Organizations Act, and (d) conspiracy to commit fraud, money laundering,

and theft. Marlin and Old National have – after great expense to the parties – abandoned their claims against all but Moody National Bank and its officer, Michael Hazelwood.

Marlin sues for himself and as the assignee of the claims of First Bank – another Indiana bank that financed the "deals." Marlin's individual injury is his payments on his guaranties to the banks. First Bank had a claim for its loan losses, and it assigned that claim to Marlin in exchange for a compromise payment from him on his guaranty of $450,000. Old National Bank sues for its losses on the loans to Delta Mike, Inc., to buy cranes that did not exist. Old National and Marlin have executed a settlement agreement and a security agreement allowing Old National to recover from culpable third parties. Delta Mike, Inc., was not a party to either agreement, and it is not a plaintiff here.

While the court seriously questions Old National's standing, because the case fails entirely, it need not separately address that issue.

6. *Conspiracy*.

In Texas, a conspiracy is simply an agreement to do something that is illegal. *See Texas v. Standard Oil*, 107 S.W.2d 550 (1937). Here, Marlin and Old National must show that Moody and Hazelwood were conspirators – that means that they must have knowingly and willfully joined with Nixon to steal from them.

7. *Ogden Account*.

Marlin first says that Moody and Hazelwood facilitated Nixon's fraud scheme when they allowed Delta Mike funds to be passed through the accounts of Nixon, L&D, and James Ogden. In July 2002, Ogden opened two accounts in his company's name, Continental Foundation Restoration. One was for operations and the other for materials.

Ogden says that he opened them at the insistence of a Moody vice president – Michael Morris – after the bank lent him money on a note that Nixon co-signed for him. Initially, Morris handled Ogden, Continental Foundation, Nixon, and L&D. Later, Michael Hazelwood managed those accounts.

From September 2002 through June 2003, Ogden's materials account received nine large wire transfers from out-of-state banks, including two from Old National. During this time, Marlin had received paperwork showing Continental Foundation as the seller of a crane. Shortly after the money was deposited to Ogden's account, it was transferred to a Nixon-controlled account. Marlin says that this was "highly unusual activity" that should have "been a red flag to the bank." Marlin does not articulate a standard that banks should apply to screen money transfers for the benefit of people like him.

Marlin also predicates his claim on the bank officers' guilty knowledge. Ogden told Morris and Hazelwood that he was acting as a middle man for Nixon to hide the buyers from the sellers. This, Marlin says, proves that they were knowing participants in Nixon's fraud and that they played an "instrumental role" in facilitating the money laundering scheme.

Contrary to Marlin's imagination, the bank – through its workers – merely did its job; it accepted transfers by cash, check, and wire from other banks for their customers and disbursed funds at its customer's request by the same means. Inter- and intra-bank transfers are evidence of banking, not a crime.

Ogden's disclosure, assuming that he did tell the bank, that he was acting as a "buffer" is a fact of business. Brokers are middlemen. They work to avoid buyers and sellers getting together without them. Masking the source of cranes or their purchasers is perfectly legal. No inference can be drawn from that statement. Even if a banker concluded that using Ogden as a medium was peculiar, his duty of care ran to the bank and not to whomever may have been dealing with Ogden or Nixon and much less to their partners. Marlin has presented no data suggesting that the bankers knew the transactions were fraudulent

Next, Marlin asserts that a conversation between Chris Ogden – James Ogden's son – and Hazelwood in May 2003 was incriminating. Specifically, he says that Chris Ogden asked Hazelwood about the tax consequences of his father's briefly having money in his account. Both sides agree that Hazelwood said that if his father and he were

concerned about the activity, then they should not do it. Still, Marlin screams conspiracy to commit fraud – by the Hazelwood and his bank. That there may have been adverse tax consequences to Ogden's being a middleman does nothing to indicate to anyone that the underlying transactions were sales of nonexistent cranes.

Worse for Marlin's petulant pleading, by May 2003 he had already been cheated by Nixon and his losses were accomplished fact; two months later, Marlin paid enough attention to Delta Mike to discover what had been happening for a few years. Hazelwood's knowledge of (a) transfers, (b) Ogden's middleman role, and (c) Ogden's tax fears caused no identifiable injury at or after that time, since the fraud was an accomplished fact when Hazelwood learned those things. That information also shows nothing about Hazelwood's conscious involvement in a fraud years before. Also, being a knowing spectator does not make you a conspirator. *See United States v. Falcone*, 311 U.S. 205 (1940); *Schlumberger Well Surveying Corp. v. Nortex Oil and Gas Corp.*, 435 S.W.2d 854 (Tex. 1969).

8. *Doing Business as Delta Crane*

Marlin says that when Nixon and he opened the account for Delta Mike, Inc., at Moody, he gave Moody an assumed name certificate showing that Delta Mike was using *Delta Crane*. He says that he told Moody that Delta Mike had the sole right to use the name, and he asked the banker to make sure that Nixon and L&D no longer used it. He now says that Moody is liable for his losses because it was "allowing" Nixon to use Delta Crane with his L&D account.

First, Marlin offers no evidence to support this allegation; he says only that Moody "continued to improperly allow Nixon to use the name Delta Crane relating to transactions in the L&D Interests account." Even if it did, a certificate that says Delta Mike is operating under a specific name does not grant it an exclusive right to that name. Marlin wrote the limitation nowhere. He cannot simply impose that responsibility on the bank by his "instruction." Parenthetically, Old National had no "deal" on the names on the accounts and, therefore, has no conceivable basis for this claim.

Moody simply honored a request from one customer – Ogden – to transfer funds to another customer – L&D. It also transferred from L&D and Nixon's personal account to Delta Mike as well as vice versa. Moody may have transferred from L&D to Delta Mike and then back to L&D all within an hour of a visit by Marlin. Still, it committed no wrong. Nixon was a signatory on all three accounts with authority to move funds between them or elsewhere. Marlin, of course, was a signatory on Delta Mike's account and had full access to its records.

Second, Marlin knew that Nixon was using the name and did nothing. In an affidavit, Marlin has sworn, "If I had known that Moody Bank would allow Nixon to continue using the Delta Crane name in conducting his business at Moody Bank, I would not have opened an account for Delta Mike at Moody Bank." (Marlin Aff. ¶ 5)

Conversely, in his deposition, he swore that he did know about Nixon's use of the name: "He was supposed to stop . . . when we bought that name, but he didn't do it. . . I didn't just set my foot down, but I was thinking about it. You know, some day." (Ex. A at 181:15-182:9).

Marlin swore that he told the bank that he was opening the corporate account on a condition that Nixon stop using Delta Crane. Yet, he knew Nixon was using it and did not close the account. He knew and did not write Hazelwood. Nixon's use of that name was not essential to his scheme, and if it were, Marlin has no knowledge that the bank intentionally, fraudulently helped Nixon. The bank is in the position of a private postal service that allows a partner to rent independently a box at the same location as the partnership.

Marlin consented to Nixon's use by his acceptance of the fact. "[O]ne who knows that he may dissent knows also that he somehow consents when he does not dissent." Hannah Arendt, *Crisis of the Republic* 88 (1972).

9. *Concerned Employees.*

Marlin says that other bank employees "knew" and were "worried" about traffic between Moody accounts. To support this, he offers hearsay statements by his lawyer

and son about conversations they had with Michelle Rutherford – Hazelwood's assistant – in August 2003.

They say that Rutherford told them that she told Hazelwood that "the transfers were not right" between the Ogden and Nixon accounts. They say that she said that Hazelwood told her not to worry about them. They recorded no statements. Later, when she was deposed, Rutherford swore to the contrary of their recollections. Responding to questions about transfers between the accounts, she said, "We did this for lots of people every day. So, this was not unusual." (Rutherford Depo. 65)

On another occasion, Nixon told Rutherford to transfer money from his account to the Delta Mike account because Marlin was coming to Texas to review the finances. When asked if she ever questioned the propriety of the transfers, Rutherford said, "No, I didn't. I didn't see a reason to."(Rutherford Depo. 23) Rutherford had no reason – or justification – for ignoring the legal request of a signatory on both accounts. She also did not question the transfers to and from Marlin in Indiana.

The hearsay is not admissible, and if it were to be regarded by the court, it would be a model illustration of the unreliability of that kind of evidence. Once Marlin knew that he had been seriously cheated by a man with whom he had done business for six years, he sent his son and an attorney to investigate. They chose to chat about the transactions, skipping the old-fashioned tedium of affidavits, statements, and records.

10. *Racketeers.*

Next, Marlin calls the bank and banker racketeers. His claim is under the Racketeer-Influenced and Corrupt Organizations Act. 18 U.S.C. § 1962(d). It requires that (a) at least two people had agreed to commit a substantive RICO offense and (b) the defendant knew the overall objective of that RICO offense and agreed to join in it. *See United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998)(Southern District of Texas Judge Sim Lake, sitting by designation).

As Marlin articulates the offense, it was "to induce financial institutions and purchasers to wire funds for the purchase of cranes by concealing the fact that the funds

were going to L&D Interests." (Resp. Moody's SJ 29). This claim is wholly empty where it is not plain malicious.

As he states his claim, he mis-restates his claim against Nixon. Inducing people to wire funds to L&D or Delta Mike, Inc., for cranes is not the wrong. If the deal involved a real crane, the wrong was Nixon's stealing the money from his partner, and that is an independent transaction from opening an account or accepting a deposit. Moody did not induce any purchaser, seller, or banker to do anything with Nixon.

If the deal involved only an imaginary crane, the wrong is not the transfer to a particular account; it is Nixon's lying about the existence of the crane, seller, and buyer.

In either case, however, Marlin cannot say that Moody and Hazelwood knew about Nixon's plan to embezzle from Marlin and defraud Old National. The closest he comes to knowledge is an assertion that they should have known. Even had he shown that they knew, he must have some real-world data to support the claim that they knowingly and willfully became a member of a conspiracy to commit the fraud of borrowing against fake sales of cranes.

The evidence is that Hazelwood and Moody merely (a) accepted nine wires that were sent by strangers to it, (b) approved two transfers between accounts of its customers, and (c) allowed Nixon to move money between his accounts. As it turned out, the bank's customer had procured the transfers by his individual deceit. Marlin concedes that none of the *intra*-bank transfers that Hazelwood approved involved money from him, Old National, or First Bank – they were funds of Minnwest Bank.

Apart from the vacuum of fact about the bank's racketeering, Marlin and the bank are secondary victims because the direct injury was to Delta Mike, Inc.; they probably do not have standing under the statute.

Finally, that defendants have benefitted from an unlawful scheme may be evidence of a conspiracy. *See Schlumberger,* 435 S.W.2d at 857. Here, however, neither Moody or Hazelwood gained from Nixon's fake sales – as Marlin admitted in his deposition. By handling Nixon's transactions just like any other customer's they were simply continuing a routine, legitimate service as a bank. The bank's benefit was a modest deposit account

for a few years much of which was before the fraud started. Hazelwood was promoted to vice-president in 2002, before his being assigned the Nixon and Ogden accounts. He was promoted to senior vice-president after Nixon's fake death. These are not ill-gotten gains.

11. *Negligence and Vicarious Liability.*

Marlin says that the bank breached its duty of care that it owed him. To prevail, Marlin must be able to show that (a) Moody owed him a duty of care, (b) Moody's actions fell below the standard of a reasonable commercial bank, and (c) Marlin suffered a loss as a direct consequence of the bank's error. In this case of an intentional wrong by a third-party, Marlin must also establish the causation from the bank's act as distinct from the defalcation of his business partner. He fails on every element of this claim.

Banks have no duty to non-customers. Marlin's relationship to Moody was two-fold: (a) he was a *shareholder* in an account holder, and (b) he was a *guarantor* to another bank of the debts of an account holder. Delta Mike, Inc., is not a party to this case; it would have to assert its claims. Marlin says he was injured by transactions between the accounts of Nixon, Ogden, and L&D. These holders have asserted no claims against Moody or Hazelwood. Also, the "error" in the bank's handling of these accounts was not a banking error at all; the error Marlin identifies is that Moody carelessly did not detect that his partner was faking cranes and invoices in the loan documents at *other* banks.

Even if Moody had had a duty to the plaintiffs, they have not shown what the duty is and that it was breached. Marlin says that the Bank Secrecy Act imposes a duty on banks to investigate, prevent money laundering, and report suspicious activity. The obligation under that statute is to the government rather than some remote victim. The obligation is not to roam through its customers looking for crooks and terrorists. By that act, banks do not become guarantors of the integrity of the deals of their customers. It does not create a private right of action and, therefore, does not establish a standard of care. *See* 12 U.S.C. § 1954-1955.

He also urges that the recommendations of Financial Action Task Force on Money Laundering are a standard at law. Suggestions are not law. The Financial Action Task Force is an inter-governmental organization that has no legislative, executive, or judicial authority. It says it is a "policy making body," but it makes recommendations about the policies its member governments and others ought, in its opinion, to follow. It is an advisory commission of the developed countries with participation of related development banks and advisory bodies. *See* www.fatf-gafi.org (established in 1989 at the G-7 Summit in Paris).

The recommendation Marlin likes essentially says that a bank should (a) know with whom it is dealing, (b) understand the structure of artificial entities, (c) understand the nature of the customer's business, and (d) monitor accounts to see that the activities are consistent with the bank's knowledge of the customer. These items were met by Moody.

Again, Moody received and sent unexceptional wire transfers between accounts with the permission of the account holder. It had no reason to know that Nixon was getting Old National to pay imaginary sellers of pretend cranes for sale to phony buyers. Marlin and Old National, on the other hand, never attempted to verify the legitimacy of the crane deals with a simple telephone call or site visit. The negligence is theirs – all theirs.

12. *Conclusion.*

After being in business with Nixon for over five years and 100 transactions, Marlin discovered that his partner was cheating him and his banks. He says that his losses are the consequence of Moody National Bank's carelessly failing to discover the fraud through the course of nine ordinary transfers over ten months. Old National and Marlin are embarrassed financially and professionally by their losses in their business with Nixon and each other. To mask their failures, they impose huge costs on the defendants and insult them gratuitously in the form of an ill-conceived complaint that blames everyone, suing twenty-five people.

Marlin lost in these purported deals because his partner went bad. Nixon had the latitude to go bad because he had perceived Marlin's sloppy management. The diligence that was due to Marlin was his own. Old National owed its depositors and the public care in its lending, but it trusted Marlin, took guaranties from him and his partner, and skipped checking further. Moody's banking operations at no time were deceptive – directly or indirectly.

Because the only culprit was in prison and broke, Marlin concocted his own scheme to recover from people who did business with Nixon and him, obscuring its baselessness in a Hydra complaint of bad legal theories.

Gene Marlin and Old National Bank will not recover from Moody National Bank or Hazelwood. Instead, they will pay them for the costs that they have imposed – not as punishment but as simple equity.

Signed August 16, 2006, at Houston, Texas.

Lynn N. Hughes
United States District Judge